Filed 6/25/21  Read v. Chuapoco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| STEVEN READ,<br><br>    Plaintiff and Appellant,<br><br>      v.<br><br>RAFAEL DE CASTRO CHUAPOCO,<br><br>    Defendant and Respondent. | H045410<br>(Santa Clara County<br>Super. Ct. No. 1-14-CV268016) |

This dental malpractice action involves the patient's challenge to the judgment entered on a jury verdict in favor of the dentist.  In May 2009, appellant Steven Read sustained severe facial injuries, including a broken jaw, when he attempted to intervene during an altercation outside of the bar that he managed.  He received surgery for the fracture that included insertion of a small metal plate and the wiring of his jaw shut. Thereafter, Read told the surgeon that his teeth no longer came together correctly (a condition known as malocclusion); the surgeon suggested that he see a dentist.  Several months after the surgery, Read consulted with his dentist, respondent Rafael de Castro Chuapoco, who recommended that he undergo a full mouth reconstruction (FMR), a procedure that involves placing crowns and veneers on teeth to correct malocclusion.  After August 2013, when the FMR work, by Dr. Chuapoco's estimate, was 90 percent complete,

Read stopped seeing Dr. Chuapoco, and Read ultimately had some crownwork performed by another dentist.

Read filed the instant lawsuit in July 2014. After a nine-day trial, on August 2, 2017, the jury returned a defense verdict, finding that Dr. Chuapoco was negligent but concluding that there was no causal relationship between his negligence and Read's claimed injuries. The court entered judgment on the verdict on September 20, 2017. Thereafter, the court denied Read's two postjudgment motions, namely, a motion for new trial pursuant to section 657 of the Code of Civil Procedure,[1] and a motion for judgment notwithstanding the verdict (JNOV motion) pursuant to section 629, subdivision (a).

On appeal, Read challenges the judgment, claiming that the court erred in refusing his instruction on causation and in granting Dr. Chuapoco's alternative instruction. He contends further that the court erroneously denied his motion for new trial on two grounds: insufficiency of the evidence to support the verdict, and irregularity in the proceedings (alleged perjury of Dr. Chuapoco). Lastly, Read argues that the court erred in denying his JNOV motion on the basis of insufficiency of the evidence. We conclude that there was no error, and we will affirm.

## I.    FACTUAL BACKGROUND

### A.    Factual Summary

The trial consisted of testimony by the two parties, Read's retained expert, Dr. Chuapoco's retained expert, and three treating dentists who were specialists. The evidence offered two very different versions regarding Read's medical treatment after the assault, his dental treatment by Dr. Chuapoco, and the necessity, performance, and outcome of that dental treatment.

The parties agree that Dr. Chuapoco had been Read's dentist since May 2005, and that Dr. Chuapoco had performed gum surgeries, replaced a crown, and performed regular

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

dental work for Read. At the time he first saw Dr. Chuapoco, Read's jaw clicked and popped, but the condition did not cause him pain. The 43-year-old Read suffered severe injuries in May 2009 when he was assaulted outside of the bar that he managed, sustaining a fractured left jaw, fractured orbital bone, broken nasal bone, and the loss of his left eye. At the time of the incident, he was suffering from multiple sclerosis. Surgery was performed to repair Read's comminuted left jaw fracture, which involved the insertion of a plate and the wiring of his jaw. Read found the placement of the wires on his gums very uncomfortable. After the wires were removed, Read complained to his surgeon that he could not close his mouth properly, and she recommended that he see a dentist.

The parties agree that Read waited a few months to see Dr. Chuapoco because Read was addressing a number of other problems from the assault, including the loss of his dominant left eye. His first visit with Dr. Chuapoco after the assault was in September 2009. Because Read could not open his mouth very wide and it was painful to do so, Dr. Chuapoco did not perform a thorough examination at that time. He agreed with Read, however, that he had malocclusion in that the left side of his mouth came together first. In later visits, Dr. Chuapoco recommended that Read receive splint therapy to stabilize his jaw and increase his range of motion, gum surgery (grafts) to address gum recession, and an FMR to correct his malocclusion. At Dr. Chuapoco's direction, Read wore a splint continuously for over one year, and he found over time that his pain was reduced and he was able to open his mouth wider. Dr. Chuapoco performed several gum grafts. And in the latter part of 2011, after Read's jaw had stabilized and he was able to open his mouth normally, Dr. Chuapoco began the FMR (crownwork). This crownwork continued over an extended period of time, with the work being staged to address different parts of Read's mouth at different times, and with temporary crowns ultimately being replaced with permanent crowns. Read's last visit with Dr. Chuapoco was in August 2013; at that point, Dr. Chuapoco told Read that the FMR work was 90 percent complete but that there were still final adjustments required.

3

From this point, the parties' versions as presented in the testimony are very different.

Read told the jury that the jaw fracture was not severe, and that his surgery was successful and without complication, i.e., his jaw was set properly. The malocclusion that Read went to Dr. Chuapoco to address did not involve a major discrepancy, and, Read's expert, Dr. Donald Missirlian, opined, should not have been treated by the placement of crowns throughout Read's mouth, i.e., an FMR. The discrepancy should have instead been addressed through the much more conservative treatment of minor orthodonture. Additionally, the extended splint therapy employed by Dr. Chuapoco was, Dr. Missirlian testified, below the standard of care because it was unnecessary to address Read's malocclusion and in fact worsened the condition. Moreover, Dr. Missirlian opined, the FMR—although it was unnecessary—was poorly executed by Dr. Chuapoco, took too long, and was done in a manner that required a complete redo by another dentist. Read stopped seeing Dr. Chuapoco after August 2013 because he was frustrated with the length of time the work was taking and did not believe his malocclusion had significantly improved. Lastly, Dr. Missirlian testified that, because crowns do not last the lifetime of the patient, Read will incur the cost of replacing them twice during his lifetime.

Dr. Chuapoco told the jury that there were significant complications from Read's jaw surgery. When the left jaw was fractured, it moved off to the right. During, surgery, the left jaw was set off to the right so that it ultimately healed off to the right, resulting in Read not being able to close his mouth properly (i.e., malocclusion). Also during surgery, a screw was placed into a nerve at the jaw, causing Read to suffer periodic shooting pain.

Dr. Chuapoco told the jury that the treatment plan he recommended for Read to address the malocclusion and complications from jaw surgery was appropriate. Gum surgery was necessary to address new areas of recession and to address specific areas that were aggravated by the wiring done during jaw surgery. Because of the pain and limited movement of Read's mouth existing as of September 2009, extended splint therapy was appropriate to stabilize the jaw and take pressure off it while it was healing. The jaw

4

stabilized and improved over time, and Dr. Chuapoco's splint therapy was, according to Dr. Warden Noble, the defense expert, above the standard of care. Dr. Chuapoco's recommendation of an FMR was, Dr. Noble opined, a proper one. The option of orthodonture was considered by Dr. Chuapoco and rejected because the bone under Read's lower front teeth was very thin. Dr. Noble agreed, stating that, because the bone was so thin, moving the lower front teeth through orthodonture would have risked the loss of the teeth. The FMR performed by Dr. Chuapoco was, Dr. Noble testified, within the standard of care. It was appropriate for Dr. Chuapoco to have proceeded deliberately, the crownwork was completed with a fine outcome, and there was no need for Read to have the work redone. The major problem was that Read stopped seeing Dr. Chuapoco before the FMR work—including final adjustments that could have a significant influence on the ultimate outcome—had been completed.

**B.     Testimony of Steven Read**

Steven Read was 51 at the time of trial (43 when the incident resulting in his jaw being fractured occurred). He began training in martial arts when he was 14. He had kickboxing and professional boxing matches over a period of approximately 10 years in the 1980's and 1990's. Read had 11 professional fights, and he regularly sparred in the ring. He suffered boxing injuries that included a broken nose, and a head injury that affected the right side of his body and caused his knees to buckle.

Read testified that while he was in college, he developed vision issues and was diagnosed with nystagmus; he stated that his left eye was dominant and that he had poor vision in his right eye. Read was diagnosed in 1998 with multiple sclerosis.

Read began seeing Dr. Chuapoco four years before the incident, in May 2005. Read reported to him at the time that he experienced regular clicking or popping of the jaw. He did not experience any pain in his jaw before the assault. Before 2009, Dr. Chuapoco, in addition to regular dental work for Read, had replaced a crown and had performed gum surgeries.

5

In the early morning hours of May 29, 2009, Read was in the process of closing the bar he managed when he went outside because he heard there was an altercation involving an off-duty security guard. After seeing the man being assaulted by six patrons, Read was hit in the left eye with a bottle. Read fell and was kicked hard in the left side of his face below the ear; he believed at the time that his left eye was "gone" and that his jaw had been broken.

Read lost his left eye in the assault. He also had bones crushed from his jaw to his nose. Included among his injuries were a broken left orbital bone, a broken nasal bone, and a broken left jaw. The jaw fracture required surgery, including insertion of a plate and the wiring of his jaw. The wires were very uncomfortable. Read felt them poking into his gums and irritating them; he felt like his gums were "melting."

After removal of the brackets from his mouth that were placed during surgery, Read felt that the teeth on the entire left side came together first, and he could not close his mouth properly. He told the medical doctor who had performed reconstructive surgery that his teeth no longer came together properly, and she recommended that he see a dentist.

Because Read was dealing with other issues, including the loss of his dominant eye and problems with his multiple sclerosis, he waited to see Dr. Chuapoco about his occlusion issue until his next scheduled cleaning in September 2019. At that time, Read had some pain in his left jaw area when he opened his mouth, and he experienced occasional sharp pain in his chin. He told Dr. Chuapoco about the pain, the fact that he could not open his mouth very wide, and that it was difficult to keep his mouth open. Dr. Chuapoco told Read that he believed the jaw pain was a TMJ (temporal mandibular joint) disorder. Read also complained to Dr. Chuapoco about his teeth not coming together properly and that his left side came together first; Dr. Chuapoco agreed this was the case.

Read testified that Dr. Chuapoco offered FMR treatment to Read to correct his malocclusion. Dr. Chuapoco never told Read that the reason for the treatment was to repair broken teeth. During the first visit and in later visits, Dr. Chuapoco told Read he planned to

use veneers to cover the tops of his teeth so that his teeth would fit together properly. Dr. Chuapoco told Read he had to grind down Read's teeth in preparation for the restorations, starting with the temporary veneers and later the permanent restorations. In addition to the veneers, Dr. Chuapoco told Read that he would treat the malocclusion with a splint that would help loosen up his jaw so that he could open his mouth wider. Dr. Chuapoco also recommended that Read have gum surgery to address gum recession, and Read consented.

Read received a splint from Dr. Chuapoco at or about the time of the first consultation in September 2009, which he said Read should wear continuously. Dr. Chuapoco explained at the time that the splint would help loosen up Read's jaw muscles, because the reconstructive dental work could not be performed until Read had a better range of motion in opening and closing his mouth. Read wore the splint but initially objected to wearing it at night. He found it comfortable to wear and ultimately did wear it at night as well. Read found that over time, in wearing the splint, the pain was reduced and he was able to open his mouth wider.

Read testified that the restoration work started in 2011, after the splint therapy and gum surgeries. Read understood that the veneer work would be done in phases. Read testified that Dr. Chuapoco did not tell him how long the veneers would be functional or that he would need to replace them after a certain period of time.

Read also testified that Dr. Chuapoco never advised him that he had sustained tooth fractures as a result of the assault. Read testified that his teeth were not damaged in the assault.

Read's last visit with Dr. Chuapoco occurred on August 29, 2013. At the time, Dr. Chuapoco told Read that the FMR was 90 percent complete. Read told Dr. Chuapoco that his bite was still not satisfactory. Dr. Chuapoco made a second splint for Read that was not comfortable, and he was making adjustments to try to get Read's teeth to fit together. Read did not return after the August 29 visit to have adjustments made to the new splint that

7

he had found uncomfortable. Read testified that after August 29, he was in a car accident and "was beyond frustrated" because Dr. Chuapoco's work had still not been completed. Despite the length of time working on the FMR, Read said that Dr. Chuapoco "had never . . . made any significant improvement of the occlusion of [his] teeth."

After leaving Dr. Chuapoco's care, Read saw Dr. Keith Cooper in December 2013, who suggested the replacement of eight molars (crowns) at an estimated cost of $20,000 to address Read's ongoing malocclusion. After the initial visit, Read's former attorney referred him to Dr. Joyce Litch, who evaluated his gums and reported that they looked healthy; she said that she did not see why they would be causing the pain he was experiencing. Dr. Litch also told Read that she did not know whether the reconstruction done by Dr. Chuapoco needed to be replaced as previously suggested by Dr. Cooper. She referred Read to a prosthodontist, Dr. Nguyen, but Read did not see him.

Dr. Cooper performed work to replace eight molars to address Read's malocclusion. Read did not see a significant change to his occlusion problem after Cooper performed his work.[2]

### C.    Testimony of Dr. Rafael De Castro Chuapoco

Dr. Chuapoco began practicing dentistry in California in 1989. From 2002 to 2004, he took a residency program concentrating on treating patients with TMJ problems, including the use of splint therapy. The course required a commitment of 40 hours a month for two years, and then hands-on work with patients. Dr. Chuapoco also attended two residency courses on mouth restoration, one course on aesthetics (e.g., color and shape of crowns), and several courses on gum surgery (grafting).

---

[2] This was Read's testimony in deposition that he acknowledged at trial. During redirect examination, Read testified that after the date of his deposition, he had consulted with Dr. Cooper further about his malocclusion. Dr. Cooper told Read that he needed to close his jaw differently, by moving his lower jaw slightly forward. Although this technique initially felt unnatural to Read, once he got used to it, he felt that his occlusion, based upon Dr. Cooper's work, was better, although it was still not satisfactory.

When Read initially came to see Dr. Chuapoco in May 2005, he indicated on a patient form that he had experienced clicking or popping of his jaw. Dr. Chuapoco testified that the clicking or popping experienced by the patient would refer to the condyle of the temporal mandibular joint. Dr. Chuapoco also determined that Read needed CT (connective tissue) grafts for four teeth to address gum recession. The CT grafts were done, at different times, for all four teeth.

Read's first visit after the assault with Dr. Chuapoco was on September 15, 2009. Read was examined, had x-rays taken, and had his teeth cleaned. Read told Dr. Chuapoco about Read's assault in which his jaw had been broken. Read complained about his bite only hitting the left side of his mouth; pain on the left side of his mandible; clicking of the jaw that was more severe than before the assault (that Dr. Chuapoco identified as crepitus, or bone-to-bone contact); and his mouth opening only about 25 millimeters (about one inch). Dr. Chuapoco did not do a complete examination at the time, and Read said he would like to defer that examination until he felt better. Read later called to cancel a follow-up appointment for September 21, indicating he wanted to wait at least two months because of the effects of the May assault made the examination painful.

The next visit was on November 19, 2009. Read's chief complaint then was that his jaw popped and was painful. Dr. Chuapoco attributed Read's current complaint about his jaw to the trauma from the May 2009 assault. Dr. Chuapoco testified that after the assault, Read's "bite . . . was way off. He was only biting on one side. And then the right side was not even touching." Dr. Chuapoco also noted that Read was experiencing severe pain in opening and closing his mouth and had resulting headaches.

From examination and comparison of current with previous x-rays, Dr. Chuapoco was able on November 19 to detect the existence of tooth fractures. Dr. Chuapoco noted at least as of October 2010 that seven of Read's teeth were fractured; at some point, Dr. Chuapoco told Read there were tooth fractures.

9

Dr. Chuapoco testified that Read needed gum surgery (CT grafts) after the assault. The surgery to address Read's fractured jaw required the wiring of the jaw shut and the placement of rubber bands. Dr. Chuapoco testified that the wires and bands had aggravated Read's gum recession and had exposed some root surfaces, thus necessitating that Dr. Chuapoco perform gum surgery.[3] Dr. Chuapoco also saw new areas of recession at two teeth on the lower left side of Read's mouth.. Dr. Chuapoco recommended CT grafting to address the recession, and he performed gum surgeries in September 2010 and May 2011.

As part of Dr. Chuapoco treatment plan for Read, he implemented splint therapy beginning in November 2010.[4] The therapy was intended to realign the jaw, relieve pain and pressure, to "allow[] the jaw to go where it is most comfortable," and assist in increasing the jaw's range of motion. Read initially wore the splint (which was an upper splint covering the teeth) continuously from November 2010 to September 2011. In January 2012, Dr. Chuapoco recommended that Read resume using the original upper splint to stabilize the jaw because Read complained about clicking, popping, and pain. The splint therapy was ultimately successful in stabilizing the joint, eliminating the crepitus, eliminating the pain, and more than doubling the size that Read could open his mouth.[5]

Dr. Chuapoco testified that once the splint therapy was successful and Read was able to open his mouth properly in September 2011, Dr. Chuapoco could begin the FMR that he

---

[3] In the years before the assault, Dr. Chuapoco had performed, at different times, four CT grafts on Read to address gum recession issues.

[4] Dr. Chuapoco testified that the reason there was a gap between September 2009 (the first appointment after the assault) and the commencement of splint therapy was that Read had "said the teeth were not at the top of his list. It was the bottom. He had concerns about his eye." Dr. Chuapoco also testified that completion of the gum surgery preceded the splint therapy.

[5] As part of his treatment of Read, in February 2010, Dr. Chuapoco requested a consultation from a specialist for a CBCT scan to evaluate Read's TMJ because of his jaw symptoms. The CBCT report was issued in February 2011. Dr. Chuapoco concluded from the report that there were ongoing changes on the left TMJ of the patient. Dr. Chuapoco could not say whether the changes occurred before or after the assault.

had determined was the appropriate treatment to address Read's malocclusion. In recommending an FMR, Dr. Chuapoco ruled out orthodontics to address the malocclusion because the bone under Read's lower front teeth was very thin. Dr. Chuapoco gave Read a referral to see an orthodontist for an opinion but Read "refused to go." Dr. Chuapoco testified that he orally advised Read regarding the full treatment plan. This included telling Read in approximately September 2011 that as long as Read consistently used the night guard at night, there should be no reason for the grafts (crowns) to be redone.

Dr. Chuapoco testified that an FMR must be performed in stages based upon areas of the mouth, starting with the six front upper teeth. He performed the FMR work for Read in stages, with the "first prep" occurring on November 17, 2011. The FMR work was suspended for several months when Read was required to resume using a splint to address his jaw pain, clicking and popping. The next FMR work was performed by Dr. Chuapoco at the end of May 2012. Work on the FMR continued with appointments in 2012 in each month from August through December. There were 17 additional FMR visits in 2013 between January and August. Read's last patient visit was on August 29, 2013.

Dr. Chuapoco testified that Read complained in or about early August 2013 about the time it was taking to complete the FMR. Dr. Chuapoco told Read at the time that the work was 90 percent complete. Dr. Chuapoco testified that, as of the last visit, there were still some adjustments that were required in future appointments to finalize Read's occlusion, and these adjustments could have had a large impact on the result. Dr. Chuapoco explained that at the end of the FMR work (after all cementing is completed), there are always post-FMR adjustments that make a large difference in the outcome of the work. Dr. Chuapoco advised Read that he would need to wear a splint for the rest of his life; compliance was critical to the success of the FMR.

Dr. Chuapoco testified that he had done approximately 20 FMR's prior to the one he performed for Read. The length of time for Read's FMR was about average.

11

### D. Dr. Keith Cooper (Treating Prosthodontist)

Dr. Cooper is a licensed dentist with a specialty practice as a prosthodontist. A prosthodontist is a "[s]pecialist in reconstructive surgery."

Read first saw Dr. Cooper as a patient on December 4, 2013. Read's chief complaint at that time was that his " 'teeth [didn't] come together correctly.' " Read reported that he had last used a night guard one month earlier, and he complained that his gums burned when he used it. Read told Dr. Cooper that the work by his prior dentist, Dr. Chuapoco, had not been finished. Dr Cooper testified that he would normally speak with the patient's prior dentist to determine the patient's past treatment. In this instance, Read instructed Cooper not to speak with Dr. Chuapoco. Dr. Cooper understood from this instruction that he could also not review Dr. Chuapoco's records; he never received or reviewed them. Dr. Cooper did not know whether Read had undergone splint therapy with Dr. Chuapoco and did not know what Read's bite looked like prior to December 2013.

Dr. Cooper confirmed Read's malocclusion during the first visit. After ordering and reviewing a CBCT scan, he noted that it disclosed that Read had "mandibular asymmetry," i.e., the left jaw was higher than the right jaw.[6] Dr. Cooper testified that this could have explained why the left side of Read's teeth hit before the right side. Dr. Cooper's initial impression, which did not change, was that Read's problems could not be corrected simply by a few crowns but required "a complex full-mouth rehab" performed by a prosthodontist. Dr. Cooper considered the option of orthodontics. One issue that suggested that orthodontics was not appropriate was that Read had substantial ("generalized moderate to severe") bone loss in anterior areas of his mouth.

Dr. Cooper talked with Read about the affordability of an FMR. They found a "compromise" to an FMR that consisted of Dr. Cooper fabricating and placing crowns on

---

[6] This finding caused Dr. Cooper concern that Read's jaw might never be stable, regardless of the nature of the reconstruction.

eight teeth to address Read's malocclusion. The first treatment date was April 21, 2014. Read had an ongoing patient relationship with Dr. Cooper as of the date of trial.

### E.     Dr. Joyce Litch (Treating Periodontist)

Dr. Litch has been licensed in California to practice dentistry for over 30 years. She is a periodontist, a dental specialty involving gum surgeries, extractions, biopsies, and implants. Dr. Litch evaluated Read in January 2014 after he was referred by his former attorney. He had one office visit with her, and a follow-up telephone call in March 2014.

Read disclosed to Dr. Litch that he had a broken jaw from a 2009 fight, and he had had his jaw wired together. Read told Dr. Litch that he had become a patient of Dr. Chuapoco in 2004 and had had approximately 10 gum surgeries over time. Read complained about burning gums in the lower and upper left anterior of his mount. Read reported further that Dr. Chuapoco had performed an FMR which had not been completed by the time of his last office visit in August 2013. Read instructed Dr. Litch not to contact Dr. Chuapoco. Read told Dr. Litch that, after leaving Dr. Chuapoco's care, he had gone to Dr. Cooper, who had recommended at minimum that four back teeth be repaired but that he would like to redo all of Dr. Chuapoco's work.

From Dr. Litch's examination, Read had good healthy gums. Concerning Read' gum complaint, Dr. Litch wrote a diagnosis in her chart of "burning mouth syndrome secondary to nerve injury after trauma." Dr. Litch had concluded that the nerve injury was the result of the surgery to repair his fractured left mandible and ramus. Dr. Litch did not find any open margins in the restorative work done by Dr. Chuapoco.

In their telephone conversation in March 2014, Dr. Litch expressed a concern to Read that he had not worn his occlusive appliance (splint) that Dr. Chuapoco had provided him. Read had told her that Dr. Chuapoco had made the new splint, and that Read had stopped using it after two or three nights because his gums burned and use of it made him sore. Dr. Litch explained that his failure to use the splint at night was significant because an occlusive device (splint) should be worn at night when the patient has had an FMR and there

13

is a history of jaw bone trauma.  She testified further that wearing a splint can minimize the possibility of the patient's bite changing.  Dr. Litch told Read that his not wearing the device was not in his best interest.

Dr. Litch testified that after Read said that Dr. Cooper recommended a complete redo of the FMR done by Dr. Chuapoco, she became concerned; she was unsure whether a complete redo was needed.  Because of this uncertainty, Dr. Litch recommended to Read that he obtain a second opinion and referred him to a prosthodontist, Dr. Nguyen.  She also thought it was significant that Read had told her that he had not followed through with Dr. Chuapoco's appointments; she stated that "if you did not finish the treatment, it's . . . a problem to say that something's wrong with the treatment."

**F.      Dr. David Hatcher (Treating Dental Radiologist)**

Dr. David Hatcher is a dentist with a specialty degree in oral and maxillofacial radiology.  He graduated from dental school in 1973, and after several years of work in dentistry, attended a three-year program in oral radiology.  The two aspects of his practice over the years have been providing (1) imaging services to the dental community, and (2) online radiology reporting services where practitioners send their films for review.  Dr. Hatcher also teaches radiology.

Dr. Hatcher was asked by Dr. Cooper to review Read's case to determine whether as a result of a trauma and fracture, there may have been a non-union that related to a problem with Read's bite (premature contact on the left posterior side of the mouth).  Dr. Hatcher was informed that the patient had broken his jaw in 2009, had surgery, and that his bite was not the same as before the trauma.  Dr. Hatcher advised Dr. Cooper after reviewing the imaging that there was no non-union with respect to the surgically repaired left jaw.  Dr. Hatcher concluded that the left condyle was smaller due to degenerative joint disease, a form of arthritis.  The consequences of these conditions are that there may be symptomatic issues with the joint and an impact on the patient's bite.  The scans showing the smaller left condyle and degenerative arthritis informed the patient's complaint about his bite.  Dr.

Hatcher testified that he could not determine the source of the bite change, but that it would have been caused by the degenerative change in the left joint or a possible misalignment of the fractured jaw when it was surgically repaired.

Dr. Hatcher also observed from the scans that the patient had a thin alveolar bone, the bone holding the lower teeth; he was therefore at greater risk with orthodonture of having the teeth move out of the bone, resulting in more root resorption. He characterized it as "an advanced case," and he noted this issue in his report to give the treating dentist "a heads-up . . . to be careful if they try and manipulate these teeth in any way."

### G.    Donald Missirlian (Plaintiff's Expert)

Dr. Missirlian is a prosthodontist, a specialist involved in tooth replacement, including crowns, bridges, restoration of implants, and mouth reconstruction. He began his dentistry practice in 1965; in 1979, he went back to graduate school for a two-year specialty program. Dr. Missirlian was at one time a professor at the University of Pacific School of Dentistry. He was retained on behalf of Read as an expert. Dr. Missirlian first saw Read in January 2014.

Dr Missilian opined that, in connection with the care Read received from Dr. Chuapoco, he "received overtreatment [in] treatment planning, and he received undertreatment in execution." He believed that Read had excellent teeth that "were all violated . . . with crown . . . restorations. They were three[-]quarter crowns and veneers" that were unnecessary. Dr. Missirlian testified that the work was done for two improper reasons: (1) because of fractured teeth that did not exist; and (2) to correct Read's bite, when the fractured jaw was properly reset and it was unnecessary to create all the crowns. Dr. Missirlian testified that Dr. Chuapoco had "a bad plan" because it was based upon the false belief that Read's condyle was displaced. Dr. Chuapoco's "solution for this problem was to crown and change the tops of all the teeth in the patient's mouth . . . [and] cut all these teeth down for the purpose of realigning the bite from a displaced condyle."

15

Dr. Missirlian opined that Dr. Chuapoco treatment of Read constituted "a gross violation of the standard of care."

Dr. Missirlian testified that Read sustained in the assault "a mildly displaced and comminuted left mandibular ramus angle fracture. So it was not a severe fracture." He opined that Read's jaw surgery had gone well and there were no complications, i.e., no complications with jaw positioning. Dr. Missirlian concluded that Read's condition after the assault involved no "major discrepancy" with his occlusion that needed to be corrected with crowns throughout his mouth. Dr. Missirlian suggested that better treatment for the "slight discrepancy" in the bite would have been to have had an orthodontist place brackets on the upper and lower teeth to correct the occlusion; this work would have been "extremely minor orthodontics."

Dr. Missirlian disagreed with Dr. Chuapoco's conclusion that Read presented with some tooth fractures after the assault. Dr. Missirlian specifically disagreed with the conclusion in a report from Dr. Jason Eisenbach of the Worker's Compensation Insurance Fund (WCIF) that there were 16 tooth fractures. Dr. Missirlian opined that there were no tooth fractures from the assault; there was only wear on some teeth from bruxism, (grinding of teeth).

Dr. Missirlian also took issue with Dr. Chuapoco use of splint therapy. Dr. Missirlian believed it was inappropriate to have had Read wear a splint fulltime for over one year to realign his jaw. He opined that the splint therapy "introduced new errors to the relationship between the upper jaw and the lower jaw, and it became, in effect, a vehicle for orthodontic change. [¶] The lower jaw changed position, but it didn't change position for the better. It changed position for the worse." He opined that splint therapy for two weeks would have been appropriate.

Dr. Missirlian was critical of the crownwork performed by Dr. Chuapoco for the FMR. He found that "[t]here were numerous areas of open margins," with "a margin [being] where the crown seals against the prepared tooth structure." He testified that

16

Dr. Chuapoco also waited too long unnecessarily between the placement of the temporary crowns and their replacement with permanent crowns. He testified that the desired time between placement of temporary and permanent crowns was two weeks, and in this instance, the time period was several months.

Lastly, Dr. Missirlian questioned the necessity of the gum surgery done by Dr. Chuapoco preparatory to the FMR.

It was the opinion of Dr. Missirlian that Read during his lifetime will need to replace all of the crowns placed by Dr. Chuapoco, probably twice, as a crown, on average, will last 10 to 15 years. Dr. Missirlian estimated that the first replacement of crowns would cost $70,000, and the second replacement of crowns would cost $56,000. Dr. Missirlian also testified that Read would incur other expenses in the future related to Dr. Chuapoco work, including orthodonture and periodontics.

## H. Warden Noble (Defendant's Expert)

Dr. Noble has been a dentist for over 50 years. After graduation in 1965 from dental school and three years in the Air Force in which he performed dental work, including oral surgery, he completed a two-year course in prosthodontics. He had been in private practice for over 40 years and had taught part-time during that period. His teaching work included instruction in treating patients with crowns and veneers, including FMR's, and addressing patients with malocclusion (from trauma or other causes). He has been involved in practice over the years with patients referred by ENT (Ear Nose and Throat) professionals for joint problems involving TMJ issues, and he has utilized splints in patient care. He was retained by the defense. Dr. Noble, inter alia, examined Read, reviewed his hospital and dental records, reviewed Dr. Chuapoco's FMR work, and prepared a report.

Dr. Noble testified that, based upon his review of the records, including hospital records, Read's medical condition after the assault included a comminuted jaw fracture, a zygoma bone fracture, a crushed nasal spine, and a crushed eyeball. He summarized that the "whole [left] part of the face was crushed." Dr. Noble described it as "a horrendous,

17

horrible trauma" that caused damage not only to bones but to soft tissue and muscles, leading to osteoarthritic degeneration. He explained that Read's comminuted jaw fracture involved a total separation or two loose pieces of the jaw. The jaw fracture resulted in the left jaw being moved to the right side. During surgery, Dr. Noble testified, the jaw was set off and to the right, which affected Read's bite permanently after the wires were removed. After the surgery, the jaw was about one-third of a tooth off on the right side, with the upper teeth on left being more to the outside of the lower teeth.

The jaw surgery, Dr. Noble testified, included the wiring of Read's jaw, including horizontal wires around his teeth. These wires went under the gums. Dr. Noble disagreed with Dr. Missirlian's assessment that the wires were not close to the gums. Dr. Noble explained that Read's reports of feeling the brackets poking into his gums and feeling like his gums were melting was consistent with Read's experiencing his gums being stripped away by the wires. The residual effect of the proximity of the wires to the gums was that Read's gums became swollen and inflamed, and then as they healed, they shrunk back, resulting in gum recession.

Dr. Noble testified that an additional complication of the jaw surgery was the placement of a screw into the nerve at the jaw. This resulted in pressure being place on the nerve, made the nerve more sensitive, and would have caused sporadic shooting pain for the patient.

With respect to gum surgery performed by Dr. Chuapoco, Dr. Noble testified that Read was prone to gum recession, and that some areas of preassault recession had worsened. And as noted, one cause of recession after assault was the use of arch bars and wires during the jaw surgery. Dr. Noble opined that it was thus appropriate to perform gum grafts as part of the overall plan in treating Read. Dr. Noble testified that the gum surgery Dr. Chuapoco performed was very successful and there was great improvement in the affected areas. The gum surgery was both within the standard of care and was good treatment related to read's jaw fracture and jaw surgery.

18

It was Dr. Noble's opinion, based upon a review of an October 2010 pretreatment model, that Read's fractured jaw "healed off to the right." This condition, which was "a defect in the setting of the jaw," required the rebuilding of Read's bite through the process used by Dr. Chuapoco of "restabiliz[ing] the relationship between the upper and lower arches." Read's malocclusion could not be resolved through orthodontics or physical therapy. Dr. Noble explained that Read, when he was younger, had had orthodontic treatment on his lower front teeth. The teeth were shorter and had less bone on the front of them, so they could not be moved through orthodonture. Moving the lower teeth through orthodonture, Dr. Noble opined, would have risked losing them completely "because the bone is paper thin or almost nonexistent on these teeth."

Dr. Noble testified that when Read presented himself to Dr. Chuapoco after the assault, there were a number of tooth fractures that were evident. Dr. Noble explained— contradicting Dr. Missirlian's testimony—that the jagged areas in those teeth were not consistent with wear, but rather represented fractures where pieces of the teeth had been chipped. Dr. Chuapoco repaired the fractured teeth in the FMR work. Dr. Noble opined that the issue of fractured teeth was not important to the FMR, which was done to restore the arch integrity, because the teeth would have been treated regardless of whether there had been fractures.

Dr. Noble testified that it was both reasonable and useful that Dr. Chuapoco required that Read use a splint on a 24/7 basis for a number of months after the assault. The splint helped to stabilize the jaw and took pressure off of it as it was healing. Dr. Noble opined that the splint therapy here was effective to stabilize Read's bite and to permit Read to eventually be able to open his mouth normally and without pain, going from 25 millimeters to 55 millimeters. From his review and comparison of 2011 and 2014 scans, Dr. Noble concluded that the left joint had actually improved and stabilized, and the jaw had regenerated and reformed. Dr. Noble believed that Dr. Chuapoco's performance of the

19

preparatory work, including the splint therapy, before placement of the crowns was "[w]ell above" the standard of care.[7]

Dr. Noble was complimentary of the technical aspects of Dr. Chuapoco's FMR work. He testified that Dr. Chuapoco had performed a "minimal reduction of [Read's] teeth" in making the crowns by using E-max material, which is extremely strong material that is bondable with the tooth. Dr. Chuapoco's minimal reduction of the enamel of the teeth also reduced greatly the chances of Read's needing future root canal work.

Dr. Noble opined that it was appropriate care for Dr. Chuapoco to have moved slowly with the restoration process for Read. By going through the preparatory steps, such as splint therapy, for a year and one-half, Dr. Noble explained, Dr. Chuapoco was able to allow for the joint to heal and stabilize before proceeding with the final restoration. Dr. Noble testified that taking time with the process was "[t]he best part about [Dr. Chuapoco's] treatment plan."

Dr. Noble testified that an August 2013 photograph at the approximate time when Dr. Chuapoco had completed the new crowns depicted "a very lovely outcome" that was obtained from the treatment with excellent alignment and stability. Dr. Noble opined that the standard of care with respect to this work was "excellent." He testified that when he examined Read, although his bite was not perfect, Read would never have a completely even bite because his joint was not stable and was prone to deterioration. But, Dr. Noble stated, the joint would be stable enough to be functional so that Read could eat, close his mouth, and be comfortable.

---

[7] Dr. Noble believed that Dr. Chuapoco had received excellent training for doing the rehabilitations or restorations that he performed on Read here. Dr. Noble felt that Dr. Chuapoco was "most definitely well above the average dentist" for dealing with cases like Read's. Dr. Noble believed that the fact that Dr. Chuapoco was not a prosthodontist did not suggest he should not have done the work. Dr. Noble concluded that Dr. Chuapoco's work in this instance was as good as or better than what Dr. Noble had seen done by prosthodontists.

Dr. Noble did not find open margins in the tooth restorations performed by Dr. Chuapoco. He disagreed with Dr. Cooper's assessment that all of the margins were open. Dr. Noble testified that he could not explain how Dr. Cooper could have found 17 open margins, while Dr. Missirlian found nine open margins.

Dr. Noble testified that he also disagreed with Dr. Cooper's view that there was a need to remove the crowns done by Dr. Chuapoco and redo them. Dr. Noble agreed with Dr. Litch that there was no need to replace the crowns; the work by Dr. Chuapoco just needed to be finished.

## II. PROCEDURAL BACKGROUND

Read filed the complaint in this action on July 16, 2014, alleging a claim against Dr. Chuapoco for dental malpractice.[8] Dr. Chuapoco answered the complaint on August 4, 2014.

The case proceeded to jury trial that commenced on July 19, 2017, and a special verdict was rendered on August 7, 2017. The jury concluded that Dr. Chuapoco was negligent (by an 11-1 vote) but also found (by a 9-3 vote) that his negligence was not a substantial factor in causing Read's harm. A judgment on the special verdict was filed on September 20, 2017.

On October 11, 2017, Read filed a notice of intention to move for new trial, and a separate notice of intention to move for judgment notwithstanding the verdict.[9] On October 23, 2017, he filed his supporting papers to the motion for new trial.[10] After a

---

[8] There was a second cause of action for loss of consortium alleged on behalf of Read's spouse, Ann Calnan. The record does not disclose the disposition of this claim.

[9] In Read's notice of intention to file a JNOV motion, he also stated that he intended to file a motion to vacate the judgment. Read did not file a subsequent motion to vacate the judgment, and the court's order made no reference to such motion.

[10] The appellate record does not include any supporting papers that Read may have filed in connection with the JNOV motion.

21

hearing on November 16, 2017, the court denied Read's motions. Read filed a notice of appeal from the judgment on December 13, 2017.[11]

### III.  DISCUSSION

#### A.  Claim of Instructional Error

##### 1.  *Contentions of the Parties*

Read contends that the trial court erred with respect to the instruction it gave, and the one it purportedly refused to give, on the question of causation. He asserts that the court refused "the appropriate instruction" concerning causation based upon the substantial factor standard, namely, California Civil Jury Instruction (CACI) No. 430. Read argues that the trial court, instead, gave Defendant's Special Instruction No. 2, which he claims was a " 'but for' instruction that served to confuse the jury, and [led] the jury to believe that Mr. Read is held to a higher legal standard than he actually should have been [*sic*]."

Dr. Chuapoco responds that Read's claim of instructional error is procedurally and substantively without merit. Dr. Chuapoco asserts that Read cannot establish that he proposed CACI No. 430, or that the court specifically refused that instruction. Dr. Chuapoco argues further that Special Instruction No. 2 was, in any event, a correct instruction of the law of causation. Lastly, Dr. Chuapoco contends that Read cannot establish that any instructional error was prejudicial.

---

[11] Read states in his notice of appeal that it is from the judgment entered September 20, 2017. He does not mention the order denying the motion for new trial or the JNOV motion. An order denying new trial is not directly appealable but may considered in an appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) In contrast, an order denying a JNOV motion is directly appealable. (§ 904.1, subd. (a)(4); see *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) Since Read's appellate claims include a challenge to the denial of his JNOV motion, that November 16, 2017 order should have been expressly designated in his notice of appeal. (*Sweatman*, *supra*, at p. 68.) Since we liberally construe notices of appeal (rule 8.100(a)(2)), we will deem Read's notice of appeal here to apply to both the judgment and the postjudgment order denying the JNOV motion. (See *Burch v. CertainTeed Corporation* (2019) 34 Cal.App.5th 341, 347-348.)

### 2. *Instructional Error Generally*

As explained by the California Supreme Court, a "party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)

This being said, however, "[t]he court's duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision. [Citation.] A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law. [Citation.]" (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553 (*Thompson Pacific*).)

The appellate court independently reviews a claim of instructional error by the trial court, " 'viewing the evidence in the light most favorable to the appellant.' [Citation.]" (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 743.) "[W]hen the jury receives an improper instruction in a civil case, prejudice will generally be found only ' "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . ." ' [Citation.]" (*Soule*, *supra*, 8 Cal.4th at p. 574.) In instances in which the claim is that the court refused to give a proper instruction, if error is found, prejudice is shown " 'only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" [Citation.]' " (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

### 3. *There Was No Instructional Error*

#### a. **No Threshold Showing of Instructional Error**

Read's appellate claim is essentially that the court erroneously (1) refused to give Read's proposed causation instruction (CACI No. 430), and (2) gave Dr. Chuapoco

proposed instruction (Special Instruction No. 2).  In his opening brief, Read cites nothing from the record below supporting this claim of error, such as citations to the clerk's transcript or reporter's transcript, indicating (1) which party proposed which specific instruction on causation, (2) whether any proposed instructions were withdrawn by the party proposing them, (3) any objections made to any instructions on causation, or (4) any argument of counsel concerning the instructions.  Read's omissions constitute a violation of appellate procedure requiring that a party support all factual and procedural assertions with proper citations to the record.  (Cal. Rules of Court, rule 8.204(a)(1)(C) [every brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"].)[12]  Because this rule *requires* that all assertions concerning facts or procedure contain a supporting record reference, the appellate court, in its discretion, may disregard any such unsupported contention.  (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970 (*Lauron*).)

Additionally, Read's failure to comply with rule 8.204(a)(1)(C) notwithstanding, it is apparent that the record before us does not adequately support Read's contention as to what transpired concerning the causation instruction ultimately given by the trial court.  Although Read claims that the trial court refused to give the appropriate causation instruction he requested, CACI No. 430, and instead gave Defendant's Special Instruction No. 2 which he claims was improper, the record before us does not bear this out.  There is no reported record of a hearing involving jury instructions proposed by the parties, including argument concerning instructions and any rulings made by the court.[13]  The only reported record is from the eighth day of trial, in which the trial court advised the jury that counsel and the

---

[12] All unspecified rule references are to the California Rules of Court.

[13] Read notes in his reply brief that "it is unfortunate that quite a bit of the discussion during trial between [the trial judge] and counsel regarding the jury instructions occurred off the record."  In fact, based upon the absence of an appellate record, this court has no indication that there was *any* discussion between counsel and the trial court concerning jury instructions in general or concerning the causation instruction in particular.

24

court had been working to finalize instructions and they would be completing that work after the anticipated close of evidence later that day. There is nothing further on the record concerning any conference regarding jury instructions, and the matter proceeded the next day with the court instructing the jury. Moreover, the record does not include the proposed instructions submitted by Read.[14] Therefore, the record presented by Read on appeal concerning his claim of instructional error does *not* show that Read (1) proposed CACI No. 430 as an instruction concerning causation, or (2) objected to the court's giving Defendant's Special Instruction No. 2. It is Read's burden as the appellant to establish by an adequate record "that the claimed [instructional] error was *not* invited by [him], or be barred from complaining about it on appeal. [Citation.]" (*Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1091, original italics; cf. *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1671-1672 [appellate court would not assume that special instruction included in defendant's proposed instructions was requested and refused, where instruction conference was not reported; appellate court inferred that defendant for tactical reasons either withdrew or did not proffer the instruction].)

As has been explained, "An appellant arguing instructional error must ensure that the appellate record includes the instructions given and refused and the court's rulings on proposed instructions. [Citations.] If the record does not show which party requested an erroneous instruction, the reviewing court must presume that the appellant requested the instruction and therefore cannot complain of error. [Citation.] Similarly, *if the record does not show whether an instruction was refused or 'withdrawn, abandoned, or lost in the shuffle,' the reviewing court must presume that the appellant withdrew the instruction.* [Citation.] '[I]t is incumbent upon . . . appellant . . . to make certain that the trial court has ruled [on a requested instruction] and that the record on appeal discloses that ruling before the alleged ruling may be assigned as error. [Citations.]' [Citation.]" (*Bullock v. Philip*

---

[14] Read's notice designating the appellate record did not include a request that the clerk's transcript include plaintiff's proposed jury instructions.

25

*Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 678-679, fn. omitted, italics added.) Here, since the record does not show whether CACI No. 430—assuming it was proposed by Read (a fact that is not demonstrated by the record before us)[15]—"was refused or 'withdrawn, abandoned, or lost in the shuffle' " (*id.* at p, 678), we presume that Read withdrew that instruction.

### b.    No Merit to Instructional Error Claim

Read contended in his motion for new trial that he requested CACI No. 430 and that Dr. Chuapoco "invited error" through his submission of Special Instruction No. 2. Dr. Chuapoco in his opposition to the new trial motion did not contest that Read and he had requested CACI No. 430 and Special Instruction No. 2, respectively. We will therefore, notwithstanding the procedural deficiencies with respect to Read's claim as discussed, *ante*, address the merits of his instructional error claim.

The causation instruction given by the trial court that Read challenges—Special Instruction No. 2—was as follows: "A legal cause of injury and damage is a cause which is a substantial factor in bringing about the injury and damage. A substantial factor in causing harm is a factor that a medical expert would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] In professional negligence cases, a plaintiff must prove that the negligence of a defendant in 'medical probability'' was a substantial factor in bringing about the injuries and damages claimed by plaintiff. This means that but for the negligence of the defendant, the plaintiff would not have been injured or damaged."

Read contends that the trial court erred and should have instead given CACI No. 430, which is as follows: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or

---

[15] Dr. Chuapoco indicates in his respondent's brief that he does not dispute that Read requested CACI No. 430.

trivial factor. It does not have to be the only cause of harm." (*Ibid.*)[16] The focal point of Read's claim of error is the last sentence of Special Instruction No.2—"but for the negligence of the defendant, the plaintiff would not have been injured or damaged." Read's contention that Special Instruction No. 2 was an erroneous instruction is without merit.

First, Read, in arguing that "[t]he proper test for proving causation is the 'substantial factor' test" appears to suggest by implication that referring to a "but for" test of causation is per se instructional error. This is not the case. In *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041 (*Mitchell*), the California Supreme Court considered two then-existing pattern instructions concerning causation: BAJI No. 3.75, which used the term "proximate cause" and was often referred to by the courts "[as] a 'but for' instruction of causation" (*id.* at p. 1044, fn. 2); and BAJI No. 3.76, which was a "substantial factor" causation instruction (*ibid.*). The high court in *Mitchell* noted that BAJI No. 3.75 had been criticized as being confusing, particularly in its use of the term " 'proximate cause' " (*id.* at pp. 1050-1052); the court contrasted it with "the 'substantial factor' test, incorporated in BAJI No. 3.76 and developed by the Restatement Second of Torts, section 431 . . . [that] has been comparatively free of criticism and has even received praise" (*id.* at p. 1052). The Supreme Court concluded that the trial court's use of BAJI No. 3.75 was error, and it held more broadly "that BAJI No. 3.75, the so-called proximate cause instruction, should be disapproved." (*Id.* at 1054.) In so holding, the high court did not disapprove the but for test itself. Rather, it held that "the 'substantial factor' test subsumes the 'but for' test. 'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.' [Citation.]" (*Id.* at 1052.)

---

[16] CACI No. 430 concludes with an optional "but for" sentence in brackets that reads: "[Conduct is not a substantial factor in causing the harm if the same harm would have occurred without that conduct.]" Read contends that the court should have given CACI No. 430 without this optional bracketed language.

Twelve years later, the Supreme Court specifically rejected the argument that *Mitchell* had repudiated the but for test of causation. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1239.) Concluding that the Court of Appeal had erred in holding that a plaintiff was not required to show that the harm would have occurred absent the attorney's negligence in a claim for transactional malpractice (*id.* at p. 1240), the Supreme Court held "that, just as in litigation malpractice actions, a plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result" (*id.* at p. 1244, original italics). Accordingly, any claim by Read that the but for test was abrogated by the Supreme Court in favor of the substantial factor test, and therefore that the trial court erred because Special Instruction No. 2 included a reference to the "but for" test, is without merit.

Second, we observe that the challenged Special Instruction No. 2 is substantively similar to CACI No. 430. Both instructions use the phrase "substantial factor" and define the phrase in a similar fashion, with Special Instruction No. 2 substituting "medical expert" for "reasonable person." And both instructions note that to be a substantial factor, it need not be the only cause of the harm.

Third, the CACI No. 430 instruction includes the "but for" sentence challenged by Read. The fact that it is in brackets does not suggest that its use here was prohibited. Rather, the brackets are simply an indication that inclusion of the "but for" sentence in the instruction is optional. The use notes explain that this "but for" sentence "does not apply to concurrent independent causes, which are multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring about the same harm. [Citations.]" (Judicial Council of Cal., Civ. Jury Instns. (2021) Directions for Use for CACI No. 430.) The present case is not one involving concurrent independent causes; Read does not contend otherwise.

Fourth, Read cites no authority to support the proposition that the language in Special Instruction No. 2 was improper. Specifically, he cites no cases in which it has been held to

28

have been error for the trial court to include the optional "but for" sentence in CACI No. 430 under circumstances similar to those here involving a claim of professional negligence against a dental practitioner. (See *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1250, fn. 9 (*Critzer*) [appellate court may disregard proposition asserted by party for which no supporting authority is cited].)

Fifth, Read argues that the last sentence of Special Instruction No. 2 identifying the but for test was redundant because the instruction already included a description of the substantial factor test.[17] Read cites no authority for the proposition that a trial court errs simply because an instruction is redundant. (*Critzer*, *supra*, 187 Cal.App.4th at p. 1250, fn. 9.) "A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law. [Citation.]" (*Thompson Pacific*, *supra*, 155 Cal.App.4th at p. 553.) There was no instructional error.[18]

## B. Motion for New Trial

### 1. Procedural Background

In his notice of intention to move for new trial under section 657, Read specified that it would be based upon 12 separate reasons.[19] In Read's subsequent moving papers, he

---

[17] Read asserts further that "the jury was apparently unfairly swayed by the 'but for' instruction to believe that Dr. Chuapoco's treatment had to have been the one and only cause of Mr. Read's injuries in order to find causation at all. The jury apparently believed that, to find causation, it must find that Mr. Read's injuries would not have happened without Dr. Chuapoco's negligence." We need not address this "conclusory argument in which the appellant fail[s] to disclose the reasoning by which [he] reached the conclusions he wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287.)

[18] Because we find no instructional error, we need not address the extensive arguments by the parties on the issue of whether the claimed error was prejudicial. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845, fn. 5 (*Benach*) [appellate courts will not address issues whose resolution is unnecessary to the disposition of the appeal].)

[19] The only statutory ground *not* specified in Read's notice was jury misconduct (see § 657, subd. (2)).

narrowed the new trial motion to three grounds, namely, insufficiency of the evidence (§ 657, subd. 6); an error in law with respect to the refusal of Read's proposed causation instruction § 657, subd. 7); and irregularity in the proceedings of the adverse party, Dr. Chuapoco, based upon his alleged perjury at trial (§ 657, subd. 1). Dr. Chuapoco opposed the motion.

On November 16, 2017, the court, after hearing argument and taking the matter under submission the same day, filed its order denying Read's motion for new trial, concluding that Read had "not met his burden in showing that a new trial should be granted pursuant to [section] 657."

### 2. *Contentions of the Parties*

Read contends that his motion for new trial should have been granted. He identifies two bases for his claim that the trial court erred in denying his motion: (1) there was insufficient evidence to support the jury verdict (§ 657, subd. (6)); and (2) there was an irregularity in the proceeding insofar as Dr. Chuapoco committed perjury in his testimony (§ 657, subd. (1)). As to the first ground, Read asserts that the trial court did not fulfill its function of weighing the evidence and considering the record as a whole in determining whether there was insufficient evidence to support the jury's verdict.[20]

Dr. Chuapoco responds that the denial of a new trial motion based upon claimed insufficiency of the evidence is reviewed for abuse of discretion, and that, applying that standard, the trial court did not err here. He takes issue with Read's assertion that the trial court did not properly perform its duties in its consideration of the motion for new trial.

---

[20] Although asserted below, Read does not specifically contend on appeal that the new trial motion should have been granted because of "[e]rror in law, occurring at the trial" (§ 657, subd. (7)) because the court committed instructional error by refusing Read's causation instruction. He therefore abandoned that claim. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.) The abandonment of the appellate claim notwithstanding, as we have discussed, *ante*, the trial court did not commit instructional error.

30

Dr. Chuapoco contends further that Read's claim that Dr. Chuapoco committed perjury merely highlights the fact that the evidence was conflicting, which is not a circumstance compelling the granting of a new trial motion.

### 3. *Motions for New Trial Generally*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute. [Citation.]" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.) Under section 657, there are seven grounds (identified in seven subdivisions) upon which a new trial may be granted, the two grounds relevant here being the following: (1) "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial"; [¶] . . . [¶] (6)"[i]nsufficiency of the evidence to justify the verdict or other decision, or the verdict or other decision is against law." In all instances, the motion for new trial may be granted only if the circumstances surrounding the ground asserted "materially affect[ed] the substantial rights of [the moving] party." (§ 657.) And in the case of a motion for new trial under subdivision (6), it may not "be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (*Ibid.*)

A ruling by the trial court on a new trial motion is reviewed for abuse of discretion. "A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal. [Citation.] An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.]" (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752 (*Fassberg Construction*).) In the case of the denial of a new trial motion based on insufficiency of the evidence, the appellate court may reverse for

abuse of discretion "only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted."  (*Ibid.*)

### 4. *New Trial Motion Was Properly Denied*

#### a. **Insufficiency of the Evidence**

Read argues generally in his opening brief that "one of the most frequent grounds" for a motion for new trial is insufficiency of the evidence to justify the verdict.  He asserts further that if the trial court concludes after a review of the entire record and after making reasonable inferences from it that a different verdict should have been reached by the jury, it should grant a motion for new trial.  We may thus surmise from his opening brief that Read contends that *in this instance*, there was insufficient evidence to support the jury's verdict, and that the trial court failed to recognize this in denying the new trial motion.  Read, however, *presents no argument whatsoever,* such as a recitation of the evidence presented and linking that evidence to the position that it was insufficient to support the jury's verdict.

It is appellant's burden of showing error.  (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822.)  "[A] conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case, is inadequate," and the appellate court may treat such claim as abandoned and not warranting being addressed on its merits.  (*Benach*, *supra*, 149 Cal.App.4th at p. 852.)  Here, Read has failed to make any showing at all to meet his burden of proving that the trial court erred in its denial of the motion for new trial on the grounds of insufficiency of the evidence to support the verdict.[21]

---

[21] The fact that Read in his reply brief includes a brief paragraph in which he asserts that the evidence showed that Dr. Chuapoco's actions were the cause of Read's injuries does not alter our conclusion that the appellate claim has been abandoned.  Issues raised for the first time in a reply brief will ordinarily not be considered by the appellate court (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 214), and, in any event, the short discussion in the reply brief is a perfunctory argument that we deem to have been abandoned.  (*Nisei Farmers League v. Labor & Workforce Development Agency* (2019) 30 Cal.App.5th 997, 1018 (*Nisei Farmers*).)

Rather than present reasoned argument in support of the claim that there was insufficient evidence to support the verdict, and, therefore, the trial court should have granted the new trial motion, Read instead argues that there was procedural error in that the court "did not weigh the evidence, and review the entire record, including reasonabl[e] inferences therefrom . . . as is required by [section] 659 [*sic*]."[22]  Read asserts that the trial court only reviewed the pleadings, memoranda and declarations, and considered the argument of counsel.  His contention is based upon the written order denying the motion for new trial in which the court, in concluding that Read had "not met his burden in showing that a new trial should be granted," recited that it had "fully reviewed and considered the pleadings, memoranda of points and authorities, declarations and supporting exhibits and heard the oral arguments of counsel."

Read's contention is apparently based upon a specific requirement of section 657 when the court *grants* a motion for new trial.  The statute provides:  "When a new trial is *granted*, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for *granting* the new trial upon each ground stated.  [¶]  A new trial shall not be *granted* upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (§ 657, italics added.)  No similar language is contained in section 657 concerning the court's obligations when it *denies* a new trial motion, and there is no requirement that the court specify its reasons for denying a motion for new trial. (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1655-1657.)

[22] In his discussion of claimed procedural error in connection with the denial of the new trial motion, Read cites to section 659.  It is apparent that the proper citation is to section 657.

Moreover, Read has not established that the trial court committed procedural error. His claim that the trial court failed to weigh the evidence or review the entire record is entirely speculative. Read's contention that the court erred is based entirely upon a recital in the court's order. He has not cited to any other aspect of the record. Indeed, he failed to designate the reporter's transcript of the hearing on the new trial motion, and we are thus left to speculate as to the matters argued by counsel and the comments of the court at that hearing. (See *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [party challenging a ruling by the trial court has the burden of showing reversible error by an adequate record].) An appellate court " 'presume[s] . . . that the court knows and applies the correct statutory and case law' " in rendering its decision. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1526.) We will presume that the trial court, in fact, weighed the evidence and reviewed the entire record in reaching its conclusion that Read had not satisfied his burden of establishing an entitlement to a new trial. (See *Lydig Construction, Inc. v. Martinez Steel Corp.* (2015) 234 Cal.App.4th 937, 945 [appellate court presumes that trial court "considered all the pertinent matters presented to it"]; *GGIS Ins. Services, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1493, 1504, fn. 1 [appellate court summarily rejects petitioners' assertion that trial court erred by failing to consider their filings, concluding that "[w]e presume that the trial court considered all of the papers filed in connection with Petitioners' motion for summary adjudication, and Petitioners have not shown otherwise"].)

The trial court did not err in denying Read's motion for new trial based upon claimed insufficiency of the evidence to support the verdict.[23]

---

[23] As we have noted, Read on appeal neither presented reasoned argument nor discussed the evidence presented at trial in support of his conclusory assertion that a new trial should have been granted because there was insufficient evidence to support the verdict, and he therefore abandoned the argument. (*Benach*, *supra*, 149 Cal.App.4th at p. 852.) We acknowledge that Read did make a greater showing in support of his insufficiency of the evidence claim in his motion for new trial filed below. But even were we to consider his trial arguments to have been reasserted on appeal, they would nonetheless fail based upon our discussion, *post*, concerning the denial of Read's JNOV motion. This is

34

## b. Irregularity in the Proceedings

Read contends that his new trial motion should have been granted based upon an irregularity in the proceedings, consisting of claimed perjury by Dr. Chuapoco. The gist of Read's position is that Dr. Chuapoco's testimony that he had reported to the Worker's Compensation Insurance Fund (WCIF) that Read had only seven tooth fractures was contradicted by two WCIF reports of March and July 2011 that Dr. Chuapoco had reported 16 and 13 tooth fractures, respectively.[24] He asserts that Dr. Chuapoco reported the tooth fractures to the WCIF to obtain authorization to perform Read's FMR work that Dr. Missirlian testified was unnecessary. Read also contends that Dr. Chuapoco made the "perjurious assertion" in his testimony that "the 27 veneers and crowns he placed in the course of Mr. Read's Full Mouth Restoration would last a lifetime with proper patient care." He argues, without any elaboration, that "[t]his testimony of Dr. Chuapoco [concerning replacement of the veneers and crowns] was false and impeachable." (See *Nisei Farmers*, *supra*, 30 Cal.App.5th at p. 1018 [perfunctory appellate arguments are deemed abandoned].)[25]

There are two threshold problems with Read's claim of error based upon irregularity in the proceedings. First, we *assume*—based upon the substance of Read's motion filed

---

simply not the rare case in which the denial of a new trial motion based on insufficiency of the evidence was an abuse of discretion because "there is no . . . conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Fassberg Construction*, *supra*, 152 Cal.App.4th at p. 752.)

[24] Because of overlaps in the two reports, there were actually 26 teeth that were reported as fractured.

[25] Read also argues that Dr. Chuapoco at one time had a website that included information that contradicted his testimony, and that the website "constitute[d] an inconsistent statement which should have been admitted into evidence." This evidence, not admitted at trial, apparently related to Dr. Chuapoco's testimony concerning the potential need of replacement of veneers and crowns. Read does not present argument that there was error in the exclusion of this evidence beyond the above-quoted statement. We therefore do not address the issue. (*Nisei Farmers*, *supra*, 30 Cal.App.5th at p. 1018 [arguments in briefs raised in perfunctory fashion will be deemed abandoned].)

below—that his contention here that the new trial motion should have been granted due to Dr. Chuapoco's alleged perjury is based upon subdivision (1) of section 657, i.e., that "[i]rregularity in the proceedings of the court, jury or adverse party." Read, however, does not identify this statutory ground in his discussion concerning Dr. Chuapoco alleged perjury. Nor does he cite any legal authority in support of the assertion that a new trial motion under section 657, subdivision (1) may be granted on the basis that a party committed perjury. The failure to cite legal authority in support of an appellate claim may result in the claim's forfeiture. (*Otay Land Co., LLC v. U.E. Limited, L.P.* (2017) 15 Cal.App.5th 806, 837.)[26]

Second, Read's recitation of the evidence concerning this claim—consisting of 12 pages of text in his opening brief—is largely unsupported by citation to the appellate record. This substantial violation of rule 8.204(a)(1)(C) includes five consecutive pages of recited evidence without a single cite to the appellate record. "It is neither practical nor appropriate for us to comb the record on [a party's] behalf." (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 888.) A party's failure to cite to the appellate record will result in the forfeiture of "the issue or argument on appeal that is presented without the record reference. [Citation.]" (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 589.)

Even if we were to consider Read's forfeited argument, we would conclude that it lacks merit. As noted, the two topics of Dr. Chuapoco's alleged perjury asserted by Read concerned (1) the number of teeth he reported to the WCIF that were fractured, and (2) his expectation that the crowns and veneers in the FMR would not require future replacement.

---

[26] We are nonetheless aware of limited authority supporting the general proposition that perjury at trial may constitute irregularity in the proceedings warranting the granting of a motion for new trial. (See *Bowler v. Roos* (1931) 213 Cal. 484, 486-487 [new trial motion should have been granted where unrebutted affidavit demonstrated perjury at trial on a material matter]; *Smith v. Mitchell* (1923) 64 Cal.App. 463, 469 [new trial granted based upon irregularity in proceedings where one party induced the other party to give false testimony].) Neither case, however, supports the argument that under the circumstances presented *in this case*, it would have been appropriate to grant a new trial motion on the basis of irregularity in the proceedings.

As to the first issue, there was a significant dispute at trial as to the existence and number of Read's teeth that were fractured as a result of the assault. Read testified that his teeth were not damaged in the assault. Dr. Chuapoco testified that he detected tooth fractures during Read's visit in November 2009 after the assault.[27] As of October 2010, when Dr. Chuapoco prepared a model of Read's teeth, Dr. Chuapoco identified seven tooth fractures. Read's retained expert, Dr. Missirlian, testified that Read had sustained no tooth fractures from the assault, and that the dental records relied on by Dr. Chuapoco merely showed wear on teeth from patient bruxism (grinding of teeth). Dr. Noble, Dr. Chuapoco's retained expert, testified that there were a number of tooth fractures that were evident when Read presented himself to Dr. Chuapoco after the assault.

Dr. Chuapoco, in his August 10, 2011 WCIF appeal letter responding to the noncertification of planned dental work—and consistent with the October 2010 model he had prepared—indicated that there were fractures to seven of Read's teeth. He testified that these were the only teeth that he ever identified as having been fractured, and he never advised the WCIF "that in excess of 15 teeth were fractured." After sending the appeal letter, Dr. Chuapoco spoke at length with Dr. Lawrence Wallace of the WCIF in which they discussed Dr. Chuapoco's treatment plan, including Dr. Chuapoco's plan that the proposed FMR was to address Read's malocclusion, not the tooth fractures. Dr. Wallace later approved Dr. Chuapoco's request for the FMR.

Although unclear from Read's presentation, we surmise that his position is that Dr. Chuapoco's alleged perjury was based upon (1) his testimony that he had determined that there were seven fractured teeth and had reported that finding to the WCIF; (2) his testimony that he never advised the WCIF that there were more than seven fractured teeth (or in excess of 15 fractured teeth); (3) contradictory evidence in a March 2011 WCIF report

---

[27] Dr. Chuapoco testified that he first detected tooth fractures from X-rays taken during Read's first visit in September 2009 after the assault, but because the examination was limited, he did not note them on the chart.

37

indicating there were 16 tooth fractures; (4) contradictory evidence in a July 2011 WCIF report that there were 13 tooth fractures (10 of which having not been identified in the March 2011 report); and (5) the inference that the information indicating a total of 26 fractured teeth in the March and July 2011 WCIF reports necessarily came from Dr. Chuapoco. The record here does not demonstrate perjury as claimed by Read. Rather, there was a factual dispute regarding whether Dr. Chuapoco ever determined and reported to the WCIF that Read had more than seven fractured teeth. The record reveals unanswered questions as to the source(s) of the information in the March and July 2011 WCIF reports indicating the existence of 16 and 13 tooth fractures, respectively.[28] One inference from the evidence is that Dr. Chuapoco was untruthful regarding his communications with the WCIF; but that is not the only inference that could be drawn from the evidence. Neither the unanswered questions regarding the sources(s) of the information in the WCIF reports nor the conflicting evidence concerning tooth fractures compels a conclusion that perjury was committed by Dr. Chuapoco.[29]

As to the second issue of the expectation of whether the crowns and veneers would need replacement, Dr. Chuapoco's testimony that Read asserts constituted perjury was (as misquoted by Read): " 'I told [Read] that if he wears his nightguards at night for life that

---

[28] The record does not reflect the existence of any impediment to either party's ability to have subpoenaed the authors of the March and July 2011 reports, Dr. Jacob Eisenbach and Tzur Gabi, respectively, to testify at trial concerning the contents of their reports or the sources of the information contained in them.

[29] Indeed, the testimony of Read's own expert suggests that there were multiple conclusions that could have been drawn from the evidence. Dr. Missirlian testified that he saw "I believe[,] six [fractured] teeth" listed in the communication from Dr. Chuapoco to the WCIF. When he was asked to explain whether Dr. Chuapoco was responsible for WCIF records indicating that every tooth was fractured, Dr. Missirlian testified that he did not see any written submissions from Dr. Chuapoco to that effect but surmised that "if someone is saying there is 24 fractures [sic] that they must have got [sic] that information from someplace."

the crowns will last for life.' "[30]  Read contends that this testimony was "perjurious" because "[o]nce Full Mouth Restoration is performed[,] periodic replacement is required."[31]  Read's contention is thus based upon the proposition that this was *an uncontested fact established at trial*.  This was not the case.

Read testified that Dr. Chuapoco never told him that, after the completion of the FMR, Read over the years would need periodic tooth replacements.  Dr. Missirlian testified that Read's crowns would need to be replaced, probably twice, during his lifetime. Dr. Cooper likewise held the view that crowns from an FMR generally do not last a lifetime and require replacement.  Although this testimony was inconsistent with Dr. Chuapoco's testimony as to his opinions concerning crown replacement which he shared with Read, Dr. Chuapoco's opinion was supported by his expert.  Dr. Noble testified that crowns have the potential to last indefinitely, although in some instances, they will fail due to matters outside of the dentist's control such as decay and gum disease.  Thus, Read's claim that Dr. Chuapoco committed perjury amounts to nothing more than a difference of opinion by dental professionals regarding the potential replacement of crowns following an FMR.

The claim that the trial court abused its discretion in denying Read's motion for new trial based upon irregularity in the proceedings (§ 657, subd. 1) is without merit.

---

[30] Dr. Chuapoco's reported testimony actually (including some testimony preceding the passage misquoted) was:  "I told [Read] that I have patients wherein I had done full-mouth reconstruction who has [*sic*] been compliant in wearing their night guard at night. Up to this day, they are still wearing the crowns that I have done.  [¶]  So for that reason, if you wear your night guard at night for life, there is no reason for those crowns to be replaced."

[31] Read, again in violation of rules of appellate procedure, does not cite to the record in support of this evidentiary fact he claims was established at trial.  (See rule 8.204(a)(1)(C).)

### C. Motion for Judgment Notwithstanding the Verdict

#### 1. *Contentions of the Parties*

Read contends that he demonstrated in his JNOV motion that there was no substantial evidence to support the jury verdict. He asserts that he showed evidence that Dr. Chuapoco's negligence directly caused harm, and that Dr. Chuapoco produced no substantial evidence that his negligence did *not* cause Read harm.

Dr. Chuapoco responds that it can be inferred that the trial court properly denied the JNOV motion because Read's failure to file points and authorities below constituted an admission that the JNOV motion lacked merit. Dr. Chuapoco argues further that, even if Read's points and authorities in support of the new trial motion were deemed to apply to his JNOV motion as well, the challenge fails because he presented only evidence favorable to his position, and failed to present all material evidence as required.

#### 2. *Motions for JNOV Generally*

The trial court, upon its own motion or upon the motion of the party aggrieved by the judgment, "shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." (§ 629, subd. (a).) The granting of such a JNOV motion must occur "before the expiration of its power to rule on a motion for a new trial." (*Ibid.*)

"The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited." (*Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1603.) As has been explained by the California Supreme Court, "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. [Citations.] The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may

40

properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 (*Hauter*).)

In reviewing a trial court's order denying a JNOV motion, "an appellate court must review the record de novo and make an independent determination whether there is any substantial evidence to support the jury's findings. [Citations.] This review is limited to determining whether there is any substantial evidence to support the jury's verdict. [Citation.] The court must accept as true the evidence supporting the verdict, disregard conflicting evidence, and indulge every legitimate inference to support the verdict. [Citation.] If sufficient evidence supports the verdict, a reviewing court must uphold the court's denial of the JNOV motion. [Citation.] If the appellant raises purely legal questions, we conduct a de novo review. [Citation.]" (*Hirst v. City of Oceanside* (2015) 236 Cal.App.4th 774, 782 (*Hirst*).

### 3. JNOV Motion Is Deemed Unmeritorious

On October 11, 2017, Read filed a notice of intention to move for judgment notwithstanding the verdict. The notice included the recital that it would be "based upon . . . the memorandum of points and authorities to be filed and served within the time permitted by CCP 659 and 659(a)." The record does not show that Read filed a memorandum of points and authorities in support of the JNOV motion. Rather, the record contains only points and authorities Read filed concerning his motion for new trial.[32]

---

[32] Although Dr. Chuapoco raised the procedural question in his respondent's brief, Read does not address in his reply brief the argument that his failure to file a supporting memorandum below should have been construed by the trial court under rule 3.1113(a) as an admission that the JNOV motion was not meritorious.

Read's apparent failure to file a memorandum of points and authorities in support of the JNOV motion contravened the California Rules of Court, which provide that "[a] party filing a motion . . . must serve and file a supporting memorandum." (Rule 3.1113(a).) That rule provides further that "[t]he court may construe the absence of a memorandum as an admission that the motion . . . is not meritorious and cause for its denial." (*Ibid.*) Rule 3.1113(a) requiring that the moving party file points and authorities in support of his or her motion applies equally to posttrial motions, including motions for new trial and for JNOV. (*Quantum Cooking Concepts, Inc. v. LV Associates, Inc.* (2011) 197 Cal.App.4th 927, 932.)

Here, in light of the fact that, based upon the record before us, Read filed no points and authorities below in support of his JNOV motion, we may infer that the trial court appropriately denied the motion on the ground that Read effectively admitted the motion was not meritorious. (See *Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 52 [trial court properly denied motion on procedural grounds where appellant's motion was supported by deficient memorandum of points and authorities].)

### 4. *Claim Regarding JNOV Motion Is Waived*

There are two additional procedural problems with Read's JNOV argument. First, the argument in support of the claim in his opening brief recites numerous facts purportedly adduced at trial that are not supported with citations to the appellate record as required by rule 8.204(a)(1)(C).[33] To repeat: " 'Any statement in a brief concerning matters in the appellate record—whether factual or procedural and no matter where in the brief the reference to the record occurs—*must be supported by a citation to the record*.' [Citation.] " (*Lauron*, *supra*, 8 Cal.App.5th at p. 970, original italics.) " 'We are a busy court which "cannot be expected to search through a voluminous record to discover evidence on a point

---

[33] There are no citations to the appellate record in the section of Read's reply brief concerning the JNOV motion.

raised by [a party] when his brief makes no reference to the pages where the evidence on the point can be found in the record." ' [Citations.]" (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745.) We may therefore disregard the unsupported assertions in Read's appellate briefs. (*Lauron*, *supra*, at p. 970.)

Second, Read's recitation of the evidence presented in this case in arguing that there was no substantial evidence to support the defense verdict is sorely lacking. An appellate court begins its analysis with the presumption that there is evidence in the record to support each finding of fact. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 (*Foreman & Clark*).) An appellant's assertion that no substantial evidence supports the factual finding requires appellant to " 'demonstrate' " that point, and "[a] recitation of only [appellant's] evidence is not the 'demonstration' contemplated . . . . Accordingly, if, as [appellants] here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief all the material evidence on the point and *not merely their own evidence*. Unless this is done the error assigned is deemed to be waived.' [Citations.]" (*Id.* at pp. 881-882, original italics.) "This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) These principles apply to an appellate challenge to a denial of a motion for judgment notwithstanding the verdict. (See *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1326-1327 [rejecting challenge to denial of JNOV motion, where appellants failed to "set forth all material evidence relating to their contentions" and did "not attempt to analyze the evidence presented at trial in light of the jury instructions actually given"].)

It is plain, based upon a comparison of the statement of facts in Read's opening brief with the detailed recitation of the evidence we have presented, *ante*, that Read has not met his obligation "to set forth in [his] brief *all* the material evidence on the point and *not merely [his] own evidence*.' " (*Foreman & Clark*, *supra*, 3 Cal.3d at p. 881, original italics.) Read omits from his briefs *all* evidence adduced through the testimony of Dr. Litch, Dr. Hatcher, and Dr. Noble, most of which is unfavorable to his case. Likewise, Read does not include

43

unfavorable testimony from Dr. Cooper, Dr. Chuapoco, and Read himself. And, in omitting any reference to Dr. Noble, Read ignores the substantial testimony by this defense expert, who rebutted point-by-point the various alleged breaches by Dr. Chuapoco of the standard of care identified by Read's expert, Dr. Missirlian. We may therefore deem waived his claim that no substantial evidence supported the jury's finding that any negligence by Dr. Chuapoco was not the cause of Read's harm. (*Foreman & Clark*, *supra*, at p. 881; see *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50 [appellant waived challenge to denial of JNOV motion where its "recitation of the facts [was] lacking in fairness and completeness . . . [and its] slanted presentation of the facts read[] more like argument"].)

### 5. No Error in Denial of JNOV Motion

The procedural deficiencies in Read's appellate claim notwithstanding, there is no merit to his assertion that the trial court erred in denying the JNOV motion. In considering the merits of Read's claim, we will make the assumption that he based his no-substantial-evidence argument below in support of urging the court to grant his JNOV motion upon the analysis presented in his memorandum of points and authorities in support of his *new trial motion*. His argument below in support of the granting of a new trial—repeated on appeal in support of a claim that the court erred in denying the JNOV motion—is that Read established that Dr. Chuapoco negligently caused harm to Read based upon injury from (1) protracted splinting, (2) an FMR that involved the "sacrifice of 28 healthy virgin teeth," (3) Read's being required to immediately have Dr. Chuapoco's FMR work redone by Dr. Cooper, and (4) Read's need for future dental treatment, including two additional FMR's. A review of the evidence in its entirety, including significant evidence unfavorable to Read's position undisclosed in his appellate briefs, belies Read's claim of error.

Read asserted below several different ways in which Dr. Chuapoco provided negligent dental care. These included (1) the decision to treat Read's malocclusion through an FMR, (2) the extended splint therapy provided to stabilize Read's jaw, (3) the quality of

44

the crownwork performed in the FMR, (4) protracted time used to complete the FMR, and (5) employing an FMR procedure that would require two replacements in the future. In assessing Read's challenge to the denial of the JNOV motion, we address these areas of claimed negligence below.

### a.  Decision to Utilize FMR Procedure

The central theme at trial of Read's claim of negligence was that Dr. Chuapoco breached the standard of care by recommending that an FMR be utilized to correct his malocclusion. Dr. Missirlian, testified that Read received "overtreatment" at Dr. Chuapoco's hands because he had excellent teeth that "were all violated . . . with crown . . . restorations" that were unnecessary. Dr. Missirlian opined that the FMR work was unnecessary to correct Read's bite after his fractured jaw was properly reset. The expert found that there was no "major discrepancy" with Read's occlusion that required crowns throughout his mouth to correct. He opined that Read's problem could have been resolved through minor orthodonture work. This theme of overtreatment of Read's malocclusion with an unnecessary FMR was emphasized in closing argument of Read's counsel.

There was significant evidence at trial contradicting Dr. Missirlian's opinions concerning Dr. Chuapoco's recommendation of the FMR to treat Read's occlusion problem. Dr. Chuapoco testified that he had ruled out orthodonture to address Read's malocclusion because of the lack of bone under the lower front teeth. He gave Read a referral to an orthodontist, which Read disregarded. Additionally, in addressing the potential treatment of Read's malocclusion after he left Dr. Chuapoco's care, Dr. Cooper considered the option of orthodontics, but because of the substantial bone loss to the anterior areas of the mouth, he felt that orthodontics was not an appropriate solution. This condition was confirmed by Dr. Hatcher, who observed from reviewing the scans that Read had a thin alveolar bone (the bone holding lower teeth), and this presented a greater risk that orthodonture would result in moving the teeth out of the bone. Dr. Hatcher characterized it as "an advanced case," and

45

he noted the issue in his report to give the treating dentist "a heads-up . . . to be careful if they try and manipulate these teeth in any way." Lastly, the defense expert, Dr. Noble, opined that Read's malocclusion could not be resolved through orthodontics. The lower front teeth were shorter and had less bone on the front of them, so they could not be moved through orthodonture. Dr. Noble testified that moving the lower teeth through orthodonture would have risked losing them completely "because the bone is paper thin or almost nonexistent on these teeth."

There is thus no merit to Read's claim that his JNOV motion should have been granted because he established that Dr. Chuapoco negligently treated him by selecting the FMR procedure to address his malocclusion and that this negligence caused him damage. (See *Hauter*, *supra*, 14 Cal.3d at p. 110 [trial court must deny JNOV motion "[i]f the evidence is conflicting or if several reasonable inferences may be drawn"].)

### b. Extended Splint Therapy

Dr. Missirlian testified that it had been improper for Dr. Chuapoco to have treated Read by having him wear a fulltime splint for more than one year to realign his jaw. Dr. Missirlian opined that extended use of the splint "introduced new errors to the relationship between the upper jaw and lower jaw." He testified that splint therapy for two weeks would have been appropriate. Related to his opinions concerning splint therapy, Dr. Missirlian opined that the condition of Read's jaw from the assault was that he had sustained "a mildly displaced and comminuted left mandibular ramus angle fracture . . . . not a severe fracture." He testified that the surgery went well and there were no complications; "the jaw was reset properly." Based upon this testimony, Read's counsel asserted in closing argument that Dr. Chuapoco's use of splint therapy violated the standard of care.

There was significant evidence contradicting Read's claim that Dr. Chuapoco was negligent in providing extended splint therapy treatment or that this treatment caused damage. Read himself testified that he found the splint to be comfortable and found that over time, his pain was reduced and he was able to open his mouth wider. Dr. Chuapoco

46

testified that after the assault, in addition to Read having a jaw that popped and experiencing severe pain in opening and closing his mouth Read's "bite . . . was way off. He was only biting on one side. And then the right side was not even touching." Because of these circumstances, part of Dr. Chuapoco's treatment plan for Read was to implement splint therapy, which was intended to realign his jaw, relieve pain and pressure, "allow[] the jaw to go where it [is most] comfortable," and assist in increasing the jaw's range of motion. Dr. Chuapoco testified that the splint therapy was successful in stabilizing the joint, eliminating pain, eliminating crepitus, and increasing range of motion (i.e., more than doubling the size that Read could open his mouth).

Additionally, Dr. Cooper testified that, in evaluating Read as a patient, he recommended splint therapy to stabilize the jaw and take pressure off the joints. Dr. Cooper stated that wearing splints was not harmful and did not cause joints to melt or erode.

Moreover, defense expert Dr. Noble opined that it was both reasonable and useful in this instance for Dr. Chuapoco to have required that Read use a splint on a 24/7 basis for an extended period after the assault. Dr. Noble related the need for the splint therapy to the nature of Read's injury and the results of his jaw surgery. Dr. Noble testified that Read had sustained "a horrendous, horrible trauma" that had caused damage not only to bones but to soft tissue and muscles that leads to osteoarthritic degeneration. Read's comminuted jaw fracture involved a total separation resulting in the left jaw being moved to the right side. During surgery, Dr. Noble testified, the jaw was set off and to the right, which affected Read's bite permanently after the wires were removed.[34] After the surgery, the jaw was about one-third of a tooth off on the right side, with the upper teeth on left being more to the outside of the lower teeth. Dr. Noble testified that this "defect in the setting of the jaw"

---

[34] Dr. Hatcher provided testimony consistent with that of Dr. Noble. Dr. Hatcher testified that the left condyle was smaller due to degenerative joint disease. This condition could result in the joint being symptomatic and having an impact on the patient's bite. Dr. Hatcher testified that the bite change would have been caused by the degenerative change of the jaw or a misalignment of the fractured jaw when it was surgically repaired.

required the rebuilding of Read's bite through the process used by Dr. Chuapoco of "restabiliz[ing] the relationship between the upper and lower arches."  Dr. Noble opined that the splint helped to stabilize the jaw and took pressure off it as it was healing, and the therapy stabilized Read's bite and permitted Read to open his mouth normally and without pain.  Dr. Noble testified that the left joint actually improved and stabilized, and the jaw had regenerated and reformed.  He opined that Dr. Chuapoco's performance of the preparatory work, including the splint therapy, before placement of the crowns was "well above" the standard of care.

This conflicting evidence compels our rejection of Read's claim that his JNOV motion should have been granted because he established that Dr. Chuapoco extended splint therapy constituted negligence that resulted in damage to Read.  (See *Hauter*, *supra*, 14 Cal.3d at p. 110.)

### c.      Quality of Crownwork

Dr. Missirlian testified that Dr. Chuapoco's FMR work was not well performed as demonstrated by the fact that there were "numerous areas of open margins" between the crown seals and the tooth structure.  Likewise, from his examination of the patient, Dr. Cooper noted on his chart that there were " '[m]ostly open margins on all . . . [28] [r]estorations.' "  The issue of open margins was highlighted in closing argument by Read's counsel as part of his position that the FMR, in addition to having been unnecessary, was poorly executed by Dr. Chuapoco.

There was, however, evidence presented to the contrary.  Dr. Noble opined that there were no open margins from the tooth restorations.  Likewise, Dr. Litch—a treating periodontist not retained by either party as an expert—testified that there were no open margins in the restorative work performed by Dr. Chuapoco.

A further claim of negligence concerning the FMR work done to address Read's malocclusion was that a new FMR was required to redo Dr. Chuapoco's crownwork.  Read saw Dr. Cooper after Read ceased his relationship with Dr. Chuapoco.  Dr. Cooper noted

Read's malocclusion; however, he did not reach a conclusion as to its cause. Dr. Cooper's initial impression, which did not change, was that Read's problems could not be corrected simply by a few crowns; rather, Read required "a complex full-mouth rehab." Read had Dr. Cooper—at his suggestion to address Read's ongoing malocclusion—replace eight molars (crowns) that had previously been done by Dr. Chuapoco at a cost of approximately $20,000. Read's counsel in closing argument emphasized Dr. Cooper's testimony in which he concluded that a complete redo of Dr. Chuapoco's FMR work was necessary.

There was evidence that contradicted Read's claim that Dr. Cooper's work was necessary to redo Dr. Chuapoco's prior crownwork. Some of that evidence was admitted through Dr. Cooper's own testimony. The dentist who succeeded Dr. Chuapoco testified that it was his practice to speak with the patient's prior dentist to determine the patient's past treatment. Dr. Cooper admitted that he did not do so in this instance—nor did he review Dr. Chuapoco's records—because Read instructed him not to speak with Dr. Chuapoco. Dr. Cooper—who was told by Read that the prior work by Dr. Chuapoco had not been finished—testified that he did not know (1) whether Read had undergone splint therapy with Dr. Chuapoco, or (2) what Read's bite had looked like prior to Read's consulting with Dr. Cooper.

Additionally, Dr. Litch testified that from Read's consultation with her, she was unsure whether a complete redo of Dr. Chuapoco's FMR, as recommended by Dr. Cooper, was needed, and she therefore referred Read to a prosthodontist for a second opinion. She also found it problematic for Read to criticize Dr. Chuapoco's treatment when Read had not followed it through to completion. And Dr. Litch was concerned that Read had not worn the nighttime splint that Dr. Chuapoco had provided him. She explained that a patient such as Read with an FMR and a history of jawbone trauma should wear a nighttime splint, the use of which can minimize the possibility of the patient's bite changing.

Dr. Chuapoco testified that he told Read in August 2013 that the work was 90 percent complete. He testified that, as of the last visit, there were still necessary adjustments which

could have had a significant impact on the final results. Dr. Chuapoco also told Read that he would need a nighttime splint for the rest of his life and that his compliance was critical to the success of the FMR.

Lastly, Dr. Noble disagreed with Dr. Cooper's view that the crowns done by Dr. Chuapoco had to be removed and redone. Dr. Noble opined that there was no need for doing so; the work of Dr. Chuapoco just needed to be finished. Dr. Noble testified further that, as of August 2013 when Dr. Chuapoco had completed the new crowns, there had been "a very lovely outcome" from the FMR with excellent alignment and stability. Dr. Noble opined that the standard of care with respect to Dr. Chuapoco's FMR work was "[e]xcellent."

Based upon this conflicting evidence, Read's claim that his JNOV motion should have been granted because he established that Dr. Chuapoco negligently performed the FMR work which caused Read damage is without merit. (See *Hauter*, *supra*, 14 Cal.3d at p. 110.)

#### d.     Time Utilized for FMR

Dr. Missirlian testified that it had been unnecessary for Dr. Chuapoco to have kept Read in a splint over a protracted time and to have waited a period of months between placing the temporary crowns and their replacement with permanent crowns. Dr. Missirlian felt that the temporary crowns should be replaced with permanent crowns "[t]he quicker the better," with the desired time being two weeks. Read testified that he was "beyond frustrated" by the length of time it took Dr. Chuapoco to complete the FMR. Read's counsel during closing argument stressed that the length of time Dr. Chuapoco had Read wear a splint and the delay in replacing temporary with permanent crowns breached the standard of care.

There was significant evidence rebutting this criticism of the length of time Dr. Chuapoco spent performing the FMR. Read acknowledged that "fixing [his] bite was [his] lowest priority." In his deposition testimony read at trial, Read testified that there were

50

many issues that contributed to a delay of two years in starting the work on the veneers. Read was dealing with many things after the assault, including recovering from his injuries, not being able to drive, and " 'dealing with a very life-changing [event].' " He testified that his " 'teeth were the last thing of all of [his] recovery issues.' "

Dr. Chuapoco testified that he was able to begin the FMR in September 2011 after the splint therapy was successful and Read was able to open his mouth properly. After the FMR started, it was temporarily suspended for a period of time because additional splint therapy was required. Dr. Chuapoco explained that an FMR must be performed in stages based upon different areas of the mouth.

Dr. Noble opined that it had been appropriate for Dr. Chuapoco to move slowly with the FMR by going through the preparatory steps of splint therapy and gum surgery before starting the crownwork. Dr. Noble testified that taking additional time allowed for the jaw to heal and stabilize, and it was "[t]he best part about [Dr. Chuapoco's] treatment plan." Dr. Noble also testified that the fact that Dr. Chuapoco waited a period of months between placement of temporary crowns and their replacement with permanent crowns was not improper.[35]

Based upon this conflicting evidence, Read's claim that Dr. Chuapoco was negligent because of the protracted time he spent performing the FMR work and that the JNOV motion should have been therefore been granted is without merit. (See *Hauter*, *supra*, 14 Cal.3d at p. 110.)

### e. Need for Future Crown Replacement

Dr. Missirlian testified that Read will probably need to replace the crownwork done by Dr. Chuapoco through the FMR two times, because crowns on average will last only 10 to 15 years. Dr. Cooper also testified that, based upon his experience, a patient's FMR

---

[35] Dr. Cooper also acknowledged that for patients with fractured jaws, the reconstruction process is more challenging, and the use of temporary crowns tends to be a longer one.

51

will not last a lifetime and will need to be redone. Read testified that Dr. Chuapoco did not tell him how long his crowns would last or that he would be required to replace them after a certain period of time. Read's counsel highlighted in his argument that Read would need two further FMR's during his lifetime to replace the crowns done by Dr. Chuapoco.

As discussed in greater detail, *ante* (see section III.B.4.b.), there was significant evidence presented rebutting Read's assertion that the crownwork performed by Dr. Chuapoco would require replacement. Dr. Chuapoco testified that he advised Read that he had patients who were consistent with wearing their nightguards and continued to wear their original crowns He told Read therefore "if you wear your night guard at night for life, there is no reason for those crowns to be replaced." Dr. Noble supported Dr. Chuapoco's view concerning the necessity of replacing crownwork from an FMR, testifying that crowns have the potential to last indefinitely, although they will fail in some cases due to matters outside of the dentist's control such as decay and gum disease.

This conflicting evidence compels us to reject Read's claim that the JNOV motion should have been granted based upon Dr. Chuapoco's negligently causing damage to Read in the form of anticipated expenses to replace the crownwork from the FMR. (See *Hauter*, *supra*, 14 Cal.3d at p. 110.)

### f. Conclusion Concerning JNOV Motion

The trial court in considering Read's JNOV motion was prohibited from weighing the evidence or assessing the credibility of witnesses. (*Hauter*, *supra*, 14 Cal.3d at p. 110.) Because the evidence was conflicting and several reasonable inferences could have been drawn from it, the court was compelled to deny the motion. (*Ibid.*)

While there was evidence from which the jury could have found Dr. Chuapoco negligent under one or more of the various theories presented by Read, there was evidence to the contrary to warrant a finding in favor of Dr. Chuapoco on each theory. Likewise, although there was evidence to support Read's various theories that Dr. Chuapoco's negligence had caused specific forms of damage to Read, there was also evidence rebutting

those theories.  It is open to speculation as to which theory of negligence the jury, by an 11-1 vote, found in favor of Read but also found, by a 9-3 vote, that his negligence was not a substantial factor in causing Read's harm.

This is simply not a case where "it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict." (*Hauter*, *supra*, 14 Cal.3d at p. 110.)  "[A]ccep[ting] as true the evidence supporting the verdict, disregard[ing] conflicting evidence, and indulg[ing]e every legitimate inference to support the verdict," because we find that  "sufficient evidence supports the verdict," we conclude that the trial court did not err in denying the JNOV motion.  (*Hirst*, *supra*, 236 Cal.App.4th at p. 782.)

## III.    DISPOSITION

The judgment is affirmed.  The order denying the motion for new trial and the motion for judgment notwithstanding the verdict is affirmed.  Statutory costs are awarded to respondent.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____
ELIA, ACTING P.J.



_____
DANNER, J.




*Read v. Chuapoco*
**H045410**